IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DONNA DeGROAT and : 
GARY CLARK, : CIVIL ACTION NO.  3:08-CV-0463
　　　　　Plaintiffs :
　　v. : (Judge Brann)
 :
CHARLES DeFEBO, :
ERIN SODEN, and :
ROBERT COLLINS, :
　　　　　Defendants :

## MEMORANDUM
February 10, 2015

Pending before this Court is a Motion for Partial Summary Judgment (ECF No. 119) filed by Defendants Charles DeFebo, Erin Soden, and Robert Collins. The motion seeks to dismiss all supplemental allegations added by Plaintiffs in their First Amended Complaint (ECF No. 79) and their Second Amended Complaint (ECF No. 94).[1]  The matter has been fully briefed and is now ripe for disposition.  In accordance with the following reasoning, Defendants' Motion for Partial Summary Judgment is granted in its entirety.

## I. BACKGROUND

Plaintiffs Donna DeGroat and Gary Clark have brought this action alleging workplace retaliation for conduct protected by the First Amendment.  For all of the time relevant to this case, Plaintiffs were employees of the Pennsylvania

---

[1] These supplemental allegations are listed in paragraphs 60-130 of Plaintiffs' Second Amended Complaint (ECF No. 94).

Department of Transportation (hereinafter "PennDOT") at the Pike County, Pennsylvania Maintenance Office.  Plaintiff DeGroat serves as the purchasing agent for the county office and continues to be employed with PennDOT.  Plaintiff Clark was employed as a heavy equipment operator and retired from the department on May 28, 2011.  At all times relevant to this action, Plaintiffs have been in a relationship and have married during the course of this litigation.

Defendants are also present and former employees of PennDOT.  Robert Collins was employed as the Pike County Maintenance Manager before his retirement on June 18, 2011.  Charles DeFebo is currently employed as the business manager for the Pike County facility and is Plaintiff DeGroat's immediate supervisor.  Erin Mazikewich (née Soden) previously worked as the labor relations coordinator for Engineering District 4-0, which includes Pike County, and is currently the business manager for the Susquehanna and Wyoming Counties' maintenance office.

This case relates to a series of workplace retaliation stemming from several complaints Plaintiffs made regarding the Defendants and the way they were conducting business.  In August 2005, Plaintiff DeGroat confronted Defendant Collins about a sexually harassing comment he had made to an intern and subsequently helped that intern to report the harassment.  Also that month, Plaintiffs drafted a letter to the Governor and Lieutenant Governor of Pennsylvania

complaining of Defendant Collins' mismanagement and the condition of the roads in Pike County. Finally, Plaintiff DeGroat filed an Equal Employment Opportunity complaint (hereinafter "EEO complaint") against Defendant Collins alleging discriminatory and disparate treatment based on her gender.

Plaintiffs originally alleged that shortly thereafter Defendants Collins and DeFebo began a series of acts against her, including, *inter alia*, writing DeGroat up late for work when she was not in fact late, moving her desk to an undesirable position next to the men's room, denying a request for annual leave, removing papers from her desk, and overzealously reviewing her work.[2]

Plaintiffs filed their initial Complaint on March 28, 2008 (ECF No. 1). Following the close of discovery, Defendants filed a Motion for Summary Judgment that was granted in part and denied in part by the Honorable James M. Munley, then assigned to this case. Subsequently, Plaintiffs were granted leave to file an Amended Complaint (ECF No. 79) adding supplemental allegations of retaliation that occurred after the filing of the original complaint and which were, allegedly, based on the initiation of this lawsuit. Later, Plaintiffs were once again granted leave to file a Second Amended Complaint (ECF No. 94).

Specifically, the new allegations by Plaintiff DeGroat include the following: (1) Defendants gave her a one-day suspension for failing to sign a personnel

---

[2] The above listed facts in this section are taken from the February 17, 2011 Memorandum of United States District Judge James M. Munley (ECF No. 59).

memorandum which she believed would have prohibited her from divulging documents to anyone outside of PennDOT including, ostensibly, her attorney; (2) constant scrutiny by Defendant DeFebo of her work; (3) Defendant Collins developed an unworkable purchase order form which was designed solely to harass her; (4) Defendants DeFebo and Collins were unresponsive to her concerns regarding one of their employees who was allegedly both passively and actively interfering with Plaintiff DeGroat's ability to do her job; (5) Defendant Collins verbally attacked her during a meeting which was called to discuss her concerns over that employee; and (6) an anonymous complainant, allegedly under the direction of Defendants, filed a complaint with the Office of the Inspector General (hereinafter the "OIG") regarding Plaintiff DeGroat's purchasing card, leading to a suspension of her card and a subsequent investigation.

The new allegations by Plaintiff Clark include the following: (1) Defendants gave him a one-day suspension for failing to sign a personnel memorandum which he also believed would have prohibited him from divulging documents to anyone outside of PennDOT including, ostensibly, his attorney; (2) during the trial of a fellow employee who had attacked Plaintiff Clark, Defendant Collins provided the defense attorney with Clark's personnel file in order to discredit him; (3) his application for the position of automotive mechanic supervisor in October 2008 was summarily rejected, allegedly with the involvement of one of the Defendants;

(4) Defendant Collins removed trees near the area in which Plaintiff Clark was working solely to harass and intimidate him; (5) Defendant Collins required Plaintiff Clark to pick up cigarette butts when he refused to act as foreman solely in order to humiliate him; (6) he did not receive out-of-class pay for specialist work that he performed, allegedly as a result of some bad faith on the part of the Defendants; (7) Defendant Collins commented to other employees that Plaintiff Clark must have been the person who got into an argument with a motorist in September 2011; (8) Plaintiff Clark was assigned to a less desirable work route in the winter of 2011; and (9) he was constructively discharged from his position when he retired because of the constant pattern of harassment on the part of the Defendants.

The Court permitted discovery to be reopened as to these new allegations. At the close of discovery Defendants moved for partial summary judgment, bringing the case to its present posture.

## II. STANDARD OF REVIEW

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" where it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" where "the evidence is such that

a reasonable jury," giving credence to the evidence favoring the nonmovant and making all inferences in the nonmovant's favor, "could return a verdict for the nonmoving party." *Id.*

The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment. *In re Bressman*, 327 F.3d 229, 237 (3d Cir. 2003) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986) (Brennan, J., dissenting)). The moving party may satisfy this burden by either (i) submitting affirmative evidence that negates an essential element of the nonmoving party's claim; or (ii) demonstrating to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's case. *Id.* at 331.

Where the moving party's motion is properly supported, the nonmoving party, to avoid summary judgment in his opponent's favor, must answer by setting forth "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. For movants and nonmovants alike, the assertion "that a fact cannot be or is genuinely disputed must" be supported by "materials in the record" that go beyond mere allegations, or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot

6

produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1); *see also*
*Anderson*, 477 U.S. at 248–50.

"When opposing summary judgment, the non-movant may not rest upon
mere allegations, but rather must 'identify those facts of record which would
contradict the facts identified by the movant.'" *Port Auth. of N.Y. and N.J. v.*
*Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2003). Furthermore, "[i]f a
party fails to properly support an assertion of fact or fails to properly address
another party's assertion of fact as required by Rule 56(c), the court may . . .
consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2).

In deciding the merits of a party's motion for summary judgment, the
Court's role is not to evaluate the evidence and decide the truth of the matter, but
to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249.
Credibility determinations are the province of the factfinder, not the district court.
*BWM, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992). Although
the Court may consider any materials in the record, it need only consider those
materials cited. Fed. R. Civ. P. 56(c)(3).

## III. DISCUSSION

## A. Plaintiffs' Statements of Facts

As a preliminary matter, Defendants argue that Plaintiffs have not shown the
existence of a genuine dispute of material facts because their response to

Defendants' Statement of Facts does not comport with Local Rule 56.1.  Rather, they contend, instead of denying Defendants' facts and citing to a portion of the record, Plaintiffs "regularly deny the statement and then launch into a recitation of facts, argument and speculation that does not address the facts that the defendants asserted." Defs.' Reply Brief at 5, June 16, 2014, ECF No. 139 (hereinafter "Defs.' Reply").  In so arguing, Defendants cite to several paragraphs of Plaintiffs' Statement of Facts to demonstrate the rambling nature of the response.

Local Rule 56.1 of the United States District Court for the Middle District of Pennsylvania provides:

> A motion for summary judgment filed pursuant to Fed. R. Civ. P. 56, shall be accompanied by a separate, short and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried.  The papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts, responding to the numbered paragraphs set forth in the statement required in the foregoing paragraph, as to which it is contended that there exists a genuine issue to be tried.  Statements of material facts in support of, or in opposition to, a motion shall include references to the parts of the record that support the statements.  All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.

M.D.Pa. Local R. 56.1.  "The purpose of this rule is obvious: it enables the court to identify contested facts expeditiously and prevents factual disputes from becoming obscured by a lengthy record." *Pinegar v. Shinseki*, Civil Action No. 1:07-CV-0313, 2009 WL 1324125 (M.D.Pa. May 12, 2009) (Conner, J.).  The requirement

of a short and concise responsive statement of facts is particularly important where, as here, a voluminous record and lengthy briefs accompany the motion. *See Park v. Veasie*, Civil No. 3:09-CV-2177, 2011 WL 1831708, at *4 (M.D.Pa. May 11, 2011) (Rambo, J.).

After reviewing the document in question, the Court finds that Plaintiffs' Statement of Facts does not comply with Local Rule 56.1. While Plaintiffs' Statement of Facts is separate from their opposition brief, it is neither short nor concise, nor limited to material facts. In fact, it is over twice as long as Defendants' Statement of Material Facts, although it contains the same number of paragraphs. Plaintiffs consistently add facts in response to Defendants' Statement of Facts which are relevant to neither the Defendants nor the allegations at issue in the instant Motion for Partial Summary Judgment. Moreover, Plaintiffs often respond to several of paragraphs from Defendants' Statement of Facts at once, sometimes denying all and sometimes admitting in part and denying in part, making it inordinately difficult for this Court to interpret what facts are actually disputed. Often it actually appears that Plaintiffs are employing their Statement of Facts to make an open-ended argument about the merits of the case, rather than responding to the facts Defendants have put forth. Furthermore, though Plaintiffs do cite to portions of the record in their factual assertions, often those portions of the record are irrelevant to the fact that they are apparently disputing, making it

very difficult for the Court to discern what is actually disputed and, moreover, whether Plaintiff has any evidentiary basis for each counter-fact asserted.

This lack of coherence, rambling nature and presence of non-material facts in Plaintiffs' Statement of Facts would actually "hinder rather than facilitate the Court's direct and accurate consideration" of Defendants' Motion for Partial Summary Judgment. *Hartshorn v. Throop Borough*, Civil Action No. 3:07-cv-01333, 2009 WL 761270, at *3 (M.D.Pa. Mar. 19, 2009) (Caputo, J.) (striking the statement of facts and subsequently dismissing the motion for summary judgment on the basis of a two-hundred and forty one paragraph statement of facts). Moreover, this "inability to comport with the rules, in turn, has left this Court to engage in a protracted deciphering which is an ineffective use of the court's time and resources and it runs contrary to the central purpose of a statement of material facts which is to *aid* the court to *expeditiously* identify factual arguments." *Breslin v. Dickinson Tp.*, Civil No. 1:09-CV-1396, 2012 WL 7177278, at *3 (M.D.Pa. Mar. 23, 2012) (quotations omitted) (Carlson, M.J.).  Consequently, this Court will strike Plaintiffs' Counterstatement of Disputed Material Facts (ECF No. 133) and will thereby deem admitted Defendants' Statement of Facts.[3]

---

[3] That being said, this Court will not simply accept Defendants' arguments without qualification; rather, this Court will still evaluate Defendants' facts and arguments within the context of the record to determine whether Plaintiffs' claims have sufficient merit to survive summary judgment.

**B. Section 1983 Retaliation Claims**

Plaintiffs bring suit pursuant to 42 U.S.C. § 1983 for violations of their freedom of speech and petition clause rights under the First Amendment.[4]  Section 1983 is not a source of substantive rights; rather, it merely provides a remedy for violations of constitutional rights.  *See City of Oklahoma City v. Tuttle*, 471 U.S. 808, 815 (1985).  To establish a claim under 42 U.S.C. § 1983, Plaintiffs must initially demonstrate that: (1) the conduct complained of was committed by a person acting under color of state law; and (2) the conduct deprived the complainant of rights secured under the Constitution or federal law. *See Sameric Corp. of Delaware, Inc. v. City of Philadelphia*, 142 F.3d 582, 590 (3d Cir. 1998).

As a preliminary matter, it has already been established that the Defendants are state actors. *See DeGroat v. Pennsylvania Dept. of Transp.*, No. 3:08cv463, 2011 WL 672416, at *3 (M.D.Pa. Feb. 17, 2011) (Munley, J.); *see also Arizona v. California*, 460 U.S. 605, 618 (1983) ("As most commonly defined, the doctrine [of the law of the case] posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.").

---

[4] As previously acknowledged, Plaintiffs' claims rest on four instances of speech for which they allege Defendants retaliated against them: (1) Plaintiff DeGroat's assistance of the intern in reporting the harassment of Defendant Collins; (2) the letter that both Plaintiffs wrote to the Governor and Lieutenant Governor of Pennsylvania complaining of Defendant Collins' mismanagement and the condition of the roads in Pike County; (3) Plaintiff DeGroat's EEO Complaint; and, now, (4) the instant lawsuit.

The United States Court of Appeals for the Third Circuit has adopted a test to evaluate a claim of retaliation for engaging in activity protected under the First Amendment. *See Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005). The plaintiff must establish: "(1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action." *Thomas v. Independence Twp.*, 463 F.3d 285, 296 (3d Cir. 2006).

## C. Issue of Public Concern

Though public employees enjoy some rights of freedom of speech under the First Amendment, that right is not absolute. *See Brennan v. Norton*, 350 F.3d 399, 412 (3d Cir. 2003) (explaining the need to balance the right of the public employee to speak against the public employer's "right to exercise some control over its work force."). A public employee's statement is protected activity when: (1) in making it, the employee spoke as a citizen, (2) the statement involved a matter of public concern, and (3) the government did not have an adequate justification for treating the employee differently from any other member of the general public as a result of the statement he made. *Hill v. Borough of Kutztown*, 455 F.3d 225, 241-42 (3d Cir. 2006) (citations omitted). The reasons for these restrictions on the speech of public employees is that "[t]he government has a substantial interest in ensuring

that all of its operations are efficient and effective.  That interest may require broad

authority to supervise the conduct of public employees. . . . Restraints are justified

by the consensual nature of the employment relationship and by the unique nature

of the government's interest." *Borough of Duryea, Pa. v. Guarnieri*, — U.S. —,

131 S.Ct. 2488, 2494 (2011); *see also San Diego v. Roe*, 543 U.S. 77, 82 (2004)

(explaining that the requirement of a public concern "reconcile[s] the employee's

right to engage in speech and the government employer's right to protect its own

legitimate interests in performing its mission."); *see also Connick v. Myers*, 461

U.S. 138, 146 (1983) ("Perhaps the government employer's dismissal of the

worker may not be fair, but ordinary dismissals from government service which

violate no fixed tenure or applicable statute or regulation are not subject to judicial

review even if the reasons for the dismissal are alleged to be mistaken or

unreasonable.").

Furthermore, the right to speak and the right to petition are "cognate rights."

*Thomas v. Collins*, 323 U.S. 516, 530 (1945).  As the Supreme Court noted in

*Guarnieri*:

> The substantial government interests that justify a cautious and restrained
> approach to the protection of speech by public employees are just as relevant
> when public employees proceed under the Petition Clause.  Petitions, no less
> than speech, can interfere with the efficient and effective operation of
> government . . . . Government must have authority, in appropriate
> circumstances, to restrain employees who use petitions to frustrate progress
> towards the needs they have been hired to achieve.

*Guarnieri*, 131 S.Ct. at 2495.  Moreover, when the petition takes the form of a lawsuit, it can be particularly disruptive to the government office because it requires active participation in response. *See id.* at 2496.  Because these two First Amendment rights share substantial common ground as they relate to claims of retaliation by public employees, they are analyzed in the same manner; that is, the right to petition, similarly to the right to speak, is only protected when it involves a matter of public concern. *See id.* at 2495 ("If a public employee petitions as an employee on a matter of purely private concern, the employee's First Amendment interest must be balanced against the countervailing interest of the government in the effective and efficient management of its internal affairs.").  "A different rule for each First Amendment claim would require employers to separate petitions from other speech in order to afford them different treatment and that, in turn, would add to the complexity and expense of compliance with the Constitution. *Id.* at 2496.

"The concept of a public concern has proven nebulous at its fringes, and eludes a definition capable of precise application that is consistent thoughout our jurisprudence." *Tayoun v. City of Pittston*, — F.Supp.2d —, Case No. 4:12-cv-0068, 2014 WL 3943739, at *6 (M.D.Pa. Aug. 12, 2014) (Brann, J.).  The United States Supreme Court has attempted to articulate what the phrase denotes in stating that

14

> Speech deals with matters of public concern when it can "be fairly
> considered as relating to any matter of political, social, or other concern to
> the community," *Connick*, 461 U.S. at 146, or when it "is a subject of
> general interest and of value and concern to the public." *San Diego v. Roe*,
> 543 U.S. 77, 83 (2004).

*Synder v. Phelps*, 131 S.Ct. 1207, 1216 (2011). Though there is no bright-line rule

for determining whether a public employee's speech constitutes a matter of public

concern, the Supreme Court has further instructed courts to engage in a case and

fact specific inquiry that considers the content, context, and form of a given

statement, "as revealed by the whole record." *Connick*, 461 U.S. at 147-48; *see*

*Tayoun*, 2014 WL 3943739 at *7.

"As the [*Connick*] Court explained it: 'The First Amendment was fashioned

to assure unfettered interchange of ideas for the bringing about of political and

social changes desired by the people. . . . Speech concerning public affairs is more

than self-expression; it is the essence of self-government. . . . Accordingly, the

Court has frequently reaffirmed that speech on public issues occupies the highest

rung of the hierarchy of First Amendment values and is entitled to special

protection.'" *Azzaro v. County of Allegheny*, 110 F.3d 968, 976 (1997) (quoting

*Connick*, 461 U.S. at 145) (citations and quotations omitted). Therefore, a court

asked whether a public employee's speech relates to a matter of public concern

must determine whether expression of the kind at issue is of value to the process of

self-governance. *See id.* On the other hand, merely personal grievances do not

constitute speech of public concern. *See Feldman v. Phila. Hous. Auth.*, 43 F.3d 823, 829 (3d Cir. 2004). Such cases essentially amount to little more than employee complaints or resentments, and they are not the province of a constitutional action. *See Connick*, 461 U.S. at 154 ("[I]t would indeed be a Pyrrhic victory for the great principles of free expression if the Amendment's safeguarding of a public employee's right, as a citizen, to participate in discussion concerning public affairs were confused with the attempt to constitutionalize the employee grievance that we see presented here.").

In the case at bar, Plaintiffs base their civil rights claims on three underlying instances in which they claim they exercised their First Amendment rights to speak and petition. In the first, during the spring of 2005, both Plaintiffs wrote a letter to the Governor and the Lieutenant Governor of Pennsylvania regarding PennDOT's disregard for public safety relating to the condition of the roads, and complaining of mismanagement of local and regional PennDOT functions by Defendant Collins. In the second, during August of 2005, Plaintiff DeGroat confronted Defendant Collins, the maintenance manager, about his acts of sexual harassment toward a college intern. Third, on February 27, 2006, Plaintiff DeGroat filed an EEO Complaint against Defendant Collins alleging discriminatory and disparate treatment due to her gender. After Judge Munley decided Defendants' first motion for summary judgment, Plaintiffs were given leave to amend their Complaint to

16

allege further acts of retaliation as a result of the filing of the instant lawsuit, the fourth basis for which Plaintiffs allege retaliatory action.

Defendants characterize the new allegations in Plaintiffs' Second Amended Complaint as relating solely to retaliation suffered as a result of this fourth basis, the filing of the instant lawsuit.  As such, they contend that these new allegations should be dismissed because the lawsuit is not of public concern but rather relates to everyday employment disputes and requests purely personal remedies.  Plaintiffs appear to respond only that it is clear that their speech did relate to matters of public concern.

The issue of whether a retaliation lawsuit can constitute a public concern is one of first impression for this Court, given the unlikely procedural posture by which the issue has arisen in the instant case.[5]  While it is true that the nature of a retaliation lawsuit is fundamentally an employee grievance in which an employee complains about mistreatment by his or her superiors and requests redress for that mistreatment, its position in relation to the concept of public concern cannot be dismissed in such a summary manner.  Rather, to examine the existence of a

---

[5] The facts in *Guarnieri* are somewhat similar to those at bar and demonstrate the distinctive issue before the Court today.  In that case, the plaintiff had filed a union grievance challenging his termination as chief of police and the arbitrator ultimately found that the borough council had committed procedural errors in connection with the termination and thereby ordered his reinstatement.  *See Guarnieri*, 131 S.Ct. at 2492.  Upon his return to the job, the council issued 11 directives instructing Guarnieri in the performance of his duties, which he claimed were in retaliation for petitioning for reinstatement in the first place.  *See id.*  However, the Supreme Court did not need to address whether the Guarnieri's filing of the retaliation lawsuit was a matter of public concern because Guarnieri only alleged that he was retaliated against for the filing of the union grievance; therefore, the only thing the Supreme Court had to consider was whether that union grievance constituted a matter of public concern.

retaliation lawsuit without considering the original conduct on which it is based would lead to an incomplete analysis of the entire content and context of the events upon which Plaintiffs base their allegations. A retaliation lawsuit cannot exist in isolation; there must of necessity be some underlying act of wrongdoing or alleged wrongdoing for such a lawsuit to exist in the first place. It would be paradoxical for the Court to say today that an employee can institute a lawsuit and recover for retaliation that they suffered for speaking out on a matter of public concern, but that their employer has free reign to retaliate against that same employee once they file a lawsuit to enforce their rights. Consequently, this Court holds that a retaliation lawsuit can constitute a matter of public concern, but only to the extent that the jury finds that the original retaliation was predicated on a matter of public concern. If, however, the jury finds that the original retaliation was predicated on conduct that does not constitute a matter of public concern, any retaliation based on the subsequent lawsuit is similarly non-actionable.[6]

Because this Court concludes that the retaliation lawsuit can only constitute a matter of public concern if the underlying First Amendment activity alleged is a

---

[6] For example, let us consider a hypothetical scenario related to the instant case. On the one hand, if the jury concludes that Plaintiff DeGroat suffered retaliation as a result of her complaint regarding the condition of the roads, which is a public concern, any retaliatory action taken due to the filing of the instant lawsuit would be similarly actionable because she was appropriately enforcing her legal rights in a judicial venue. If, however, the jury ultimately concludes that Plaintiff DeGroat only suffered retaliation as a result of her EEO Complaint, which this Court will shortly explain is not a matter of public concern, any retaliation suffered as a result of the filing of the instant lawsuit would not be a public concern. This would be the case despite the fact that Plaintiff DeGroat initially alleged retaliation based upon the letter regarding the condition of the roads, because in this second hypothetical situation, the jury ultimately found her argument regarding that letter to be meritless.

matter of public concern, we must now turn our attention to the determination of whether those other three bases of alleged retaliation constitute matters of public concern. *Connick* has particular applicability to the question of whether the letter which the Plaintiffs sent to the Governor and the Lieutenant Governor of Pennsylvania is of public concern.  In that case, a former assistant district attorney brought a civil rights action against the district attorney in which she contended that her employment was unlawfully terminated after she chose to exercise her First Amendment right to speak. *Connick*, 461 U.S. at 141.  She did so in the form of a questionnaire distributed to other employees concerning the office transfer policy, office morale, the need for a grievance committee, the level of confidence of the employees in certain supervisors, and whether employees felt pressured to work in political campaigns. *Id.*

In rejecting the plaintiff's argument, the Supreme Court ruled that the only part of the questionnaire which dealt with a matter of public concern was that of the question regarding pressure to work in political campaigns. *Id.* at 149.  In ruling that the other matters, which dealt entirely with the internal workings of a government office, were not a public concern, the Court stated, "To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark – and certainly every criticism directed at a public official – would plant the seal of a constitutional case. . . . [T]he First Amendment

does not require a public office to be run as a roundtable for employee complaints over internal office affairs." *Id*.  Following this case, therefore, speech regarding the manner in which a government office is operated is not sufficient to create a First Amendment right for public employees.

Based on this Supreme Court precedent, any complaint that Plaintiffs made to the Governor and Lieutenant Governor of Pennsylvania regarding mismanagement by Defendant Collins cannot be a matter of public concern because it deals with the internal functioning of the governmental office. However, the second part of the letter discussing the disregard of public safety and the poor condition of the roads is undoubtedly a public concern.  That is, the condition of the roads and the capacity and willingness of PennDOT to fix any hazards that may create a danger to public safety is undoubtedly of concern to the community because almost every member of the community must in some manner traverse those roads daily.  Such a statement which genuinely deals with public safety must necessarily be of public concern.

The next two bases on which retaliation is alleged are complaints of sexual harassment and discrimination, one in the form of an EEO complaint and one in the form of a complaint to a supervisor.  "Claims of sexual and racial discrimination can constitute matters of public concern, even if plaintiff makes

those claims in private." *Middleton v. Deblasis*, 844 F.Supp.2d 556, 564 (E.D.Pa.

2011); *see also Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410, 415-16 (1979).

In *Azzaro v. County of Allegheny*, the United States Court of Appeals for the

Third Circuit held that an employee's internal complaint regarding a single,

isolated incident in which a supervisor sexually harassed her constituted speech on

a matter of public concern.  *See Azzaro*, 110 F.3d at 968.  In so holding, the court

relied on two factors: first, that the harassment was practiced by someone

exercising authority in the name of a public official and second, that the complaint

related to wrongdoing on the part of an elected official.  *See id.* at 978.  The *Azzaro*

court rejected the notion that there need be a systemic problem of discrimination in

the governmental agency in order to evaluate sexual discrimination or harassment

as a matter of public concern.  *See id.* at 980; *see also Morgan v. Covington Twp.*,

563 Fed.Appx. 896, 901 ("A complaint arising out of public employment need not

include indications that there is a systemic problem interfering with the public

agency's performance of its governmental functions to address a matter of public

concern.) (citations omitted).  However, the court also clarified that this

determination was a result of a very specific set of facts, stating, "[W]e do not

suggest that all public employee complaints about sexual harassment are matters of

public concern.  We do believe, however, that *under all of the surrounding*

*circumstances*, Azzaro's reports address a matter of public concern *even though* they referred to a single incident." *Azzaro*, 110 F.3d at 980 (emphasis added).

In another Third Circuit opinion, *Montone v. City of Jersey City*, the court held a police officer's speech alleging sexual harassment by a superior against herself and several other fellow officers involved a matter of public concern. *Montone v. City of Jersey* City, 709 F.3d 181, 194-95 (3d Cir. 2013).  In that case, the plaintiff had complained about sexual harassment by her superior dating back to the 1990s, when she successfully brought a sexual harassment lawsuit.  *See id*. at 193.  She continued to complain about sexual harassment even after the conclusion of the lawsuit and further complained about sexual harassment experienced by other fellow female officers. *See id.*  The court based its holding in large part on the fact that there were "at least three separate instances of alleged sexual harassment [there], and the inappropriate conduct was not directed solely at Montone." *Id.*at 194.  Although the supervising police officer was not an elected official as in *Azzaro*, the court stated that "these facts otherwise present a stronger argument that Montone's speech was related to a matter of public concern than was presented in *Azzaro*, which referred to only a single incident." *Id.* at 194-95.

Similarly, in *Campbell v. Galloway*, the United States Court of Appeals for the Fourth Circuit held that a police officer's reports of sexual harassment and gender discrimination amounted to a public concern.  *See Campbell v.* Galloway,

483 F.3d 258, 270 (4th Cir. 2007).  The court noted that "[t]o conclude, as the defendants would have us do, that a personal complaint about discrimination affecting only the complaining employee can *never* amount to an issue of public concern could improperly limit the range of speech that is protected by the First Amendment." *Id.* at 269.  In so holding, the court was particularly swayed by the fact that the plaintiff had reported multiple instances of inappropriate conduct directed towards her by multiple different supervising officers, and that her complaints alleged sexual harassment directed to other female members of the police force as well. *See id.* at 269.  Moreover, the court found that the plaintiff's complaints involved improper treatment of the public in addition to the female officers. *See id.* at 270.

In contrast, in *Middleton v. Deblasis*, the United States District Court for the Eastern District of Pennsylvania decided that it did not rise to the level of a public concern when a police officer brought a retaliation claim against her employer after making allegations of racial and sexual discrimination. *Middleton*, 844 F.Supp.2d at 565.  In that case, the court stated that "plaintiff 'complain[s] solely about [her] own abuse and mistreatment by superiors,' which is not a matter of public concern. *Id.* (citing *Bell v. City of Philadelphia*, 275 Fed.Appx. 157, 159 (3d Cir. 2008)).

Plaintiff DeGroat argues that she was retaliated against in part because she filed an EEO complaint regarding discriminatory treatment by Defendant Collins due to her gender.  Given the foregoing case law, it seems evident that this is not a matter of public concern.  This situation is more akin to that of *Middleton* than to that of *Azzaro*, *Montone*, or *Campbell.*  Though there need not necessarily be an allegation of widespread or systemic discrimination to rise to the level of public concern, it is clear that public concern requires more than one or even a few isolated instances of discrimination.  Rather, in *Azzaro* the determination hinged in large part on the circumstance that the supervisor was an elected official.  Moreover, *Montone* and *Campbell* relied heavily on the existence of numerous instances and numerous employees who were harassed or discriminated against.  In contrast, *Middleton* involved only one employee alleging discrimination against herself, asserting no other facts which would tend to make her plight of particular concern to the public.  With regard to this issue, *Azzaro* does in fact implicitly acknowledge that one single incident of harassment without any additional, exacerbating factor, is not enough to elevate a purely personal employee grievance to the level of a public concern. *See Azzaro*, 110 F.3d at 980 ("We do believe, however, that under all of the surrounding circumstances, Azzaro's reports address a matter of public concern even though they referred to a single incident.").

Here we have at most a few incidents of gender discrimination of a Pike County maintenance manager of PennDOT, alleged by only one employee. Defendant Collins, the maintenance manager, is not an elected official nor, more importantly, does he appear to occupy a position of particular trust in relation to Pennsylvania citizens.  Consequently, Plaintiff DeGroat's EEO complaint bears greater relation to an employee grievance of the kind articulated in *Connick* and is not a public concern.

The same analysis applies in determining that Plaintiff DeGroat's report to her superiors of the sexual harassment experienced by the intern is not of public concern.  The fact that she reported the harassment of someone else is of note because it disclaims any argument that her speech was exercised for purely personal motivations, but it does not affect the remainder of the analysis. The identity of the complainant and her relation to the victim does not change the content of the statement, which is purely personal, albeit not to Plaintiff DeGroat but rather to the intern on whose behalf she created the report.  Moreover, the same remains true as to the observance that Defendant Collins' does not occupy a position of trust in relation to the public of Pennsylvania.  As such, neither Plaintiff DeGroat's EEO complaint nor her report of the harassment of the intern are of public concern.

25

Considering the foregoing analysis, only retaliation predicated on the portion of the letter detailing the condition of the roads and the threat posed to public safety would be a public concern.  Therefore, retaliation based on the filing of the instant lawsuit can only be actionable to the extent a jury finds that some of the original allegedly retaliatory conduct was taken as a result of that portion of the correspondence to the Governor and the Lieutenant Governor of Pennsylvania.

**D. Personal Involvement**

Defendants argue that Plaintiffs have not sufficiently demonstrated the personal involvement of any of the Defendants with regards to several of the allegations in the Second Amended Complaint.  Specifically, Defendants argue that none of them had any personal involvement in: (1) the OIG investigation, (2) the furnishing of Plaintiff Clark's personnel file to an opposing attorney, (3) the rejection of Plaintiff Clark's application for automotive mechanics supervisor, (4) the failure to provide Plaintiff Clark with out-of-class pay, and (5) the change in his snow plow route.  Plaintiffs, for their part, respond only with unsubstantiated allegations that some of these events could not have occurred without the personal involvement of one of the Defendants and that therefore they clearly were personally involved.  Plaintiffs do not, however, cite to any portion of the record to back up these conclusory accusations.

It is elementary that a defendant in a civil rights action must have personal involvement in the alleged wrongdoing; liability cannot be predicated on a theory of respondeat superior. *See Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005). Plaintiffs can demonstrate personal involvement through "allegations of personal direction or of actual knowledge and acquiescence." *Rode v. Dellaciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). Moreover, supervising public officials do not have an affirmative constitutional duty to "supervise and discipline so as to prevent violations of constitutional rights by his or her subordinates." *Chinchello v. Fenton*, 805 F.2d 126, 133 (3d Cir. 1986). This remains true despite allegations of a pattern of constitutional violations; the supervising official must have played an "affirmative part" in the misconduct. *Id.* "[I]t is not enough for a plaintiff to argue that the constitutionally cognizable injury would not have occurred if the superior had done more than he or she did." *Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989).

    1.    OIG Investigation into Plaintiff DeGroat's Purchasing Card

With regards to the OIG investigation of Plaintiff DeGroat's purchasing card activity, Defendants argue that none of them worked for the OIG and there is no evidence of them taking any action to prompt the investigation. In fact, they argue, Defendant Collins had retired a month and a half before the investigation even began. Plaintiffs respond that "[i]t is not conceivable that Mr. DeFebo would not

have conferred with OIG on the situation involving any radar investigation at the

Pike County Shed . . . . This is particularly so because Mr. DeFebo signed off on

every transaction decision and was selectively not investigated . . ." Plaintiffs'

Brief in Opp. at 36, Apr. 28, 2014, ECF No. 135 (hereinafter "Pls.' Opp.").

Defendants are correct in their assertion that Plaintiff has not proven a

genuine dispute of material fact that any of the Defendants were personally

involved in the OIG investigation into Plaintiff DeGroat's purchasing card

activities. Rather, the uncontroverted evidence in the record clearly demonstrates

that the decision to suspend Plaintiff DeGroat's purchasing card was made by the

office of Diane Chamberlain, the Director of the Bureau of Office Services for

PennDOT, and Ms. Chamberlain was clear that she did not speak with anyone

from Pike County prior to making that decision. Diane Chamberlain Deposition at

19, 107 (hereinafter "Chamberlain Dep.").

Moreover, the evidence establishes that the corrective action plan which was

implemented for Plaintiff DeGroat following the reinstatement of her purchasing

card was not disciplinary.  Jeanne Peffer Deposition at 33 (hereinafter "Peffer

Dep.").  Rather, this appears to be a common practice for anyone who has had their

card suspended.  *Id*. at 34.  Nevertheless, regardless of whether the practice was

disciplinary or not, Plaintiffs have put forth no evidence whatsoever that any of the

Defendants had any involvement in institution of the corrective action plan.

28

Though it is not clear to this Court who initially began the investigation or who reported Plaintiff DeGroat to the OIG in the first place, Plaintiffs have not made any affirmative showing that it was one of the Defendants so as to create a genuine dispute of material fact. As such, summary judgment is granted for the Defendants with regard to this allegation.

　　　　2.　　Rejection of Plaintiff Clark's Application

Defendants next argue that there is no evidence establishing that Defendant Collins was personally involved in rejecting Plaintiff Clark's application for Automotive Mechanic Supervisor because that decision came directly from Gail Josulkevicz, a Human Resources employee. Plaintiffs contend that Defendant Collins was the only one who could make the decision on who was hired for the Automotive Mechanic Supervisor position, although again they fail to cite to any portion of the record to demonstrate that this is in fact the procedure in the Pike County PennDOT office. They go on to argue that "[a]nyone who knows politics in the management of County Sheds all across the state knows that for the last 100 years the County Manager makes those decisions. The County Shed has always been a rich source of patronage and that has never changed." Pls.' Opp. at 37.

Defendants are correct that the letter of rejection came directly from Gail Josulkevicz at the human resources office. Gary Clark Deposition, Ex. M (hereinafter "Clark Dep."). The letter states, "Unfortunately, we cannot consider

you for this position.  Although your experience is impressive, it does not meet the minimum experience and training that is required for this position." *Id*.  Plaintiff Clark's own testimony establishes that he has no reason to believe that Defendant Collins was behind this rejection other than the fact that Defendant Collins appeared to be somewhere in the vicinity every time something untoward occurred to Clark and that Defendant Collins had been an employee in the PennDOT office for many years.  Clark Dep. at 146-47.  Specifically, he had no knowledge of whether Defendant Collins had friends in the HR department and no one had ever intimated to him that the reason his application had been rejected was because of Defendant Collins' actions.  *Id*.  Moreover, Plaintiffs provide no evidence, other than Plaintiff Clark's belief, that Defendant Collins had anything at all to do with the rejection of his application.  Consequently, summary judgment must be granted on this allegation because there is no genuine dispute of material fact that Defendant Collins was personally involved.

> 3.     <u>Failure to Provide Out-of-Class Pay to Plaintiff Clark</u>

Defendants next claim that Defendant Collins had nothing to do with Plaintiff Clark not receiving a specialist's pay rate for operating a Gradall because Defendant Collins has no part in payroll operations for his position.  Plaintiffs do not respond to this argument.

The record establishes that the foreman makes out the payroll for the day and passes it on to the assistant maintenance manager for approval.  Clark Dep. at 153.  From there, the assistant maintenance manager passes it on to the payroll clerk.  *Id*. Plaintiff Clark was unsure who caused this failure to provide him out-of-class pay.  *Id.* at 152-56.  However, Plaintiffs have presented no evidence that any of those three positions belonged to Defendant Collins, or that he otherwise had any responsibility to review payroll documents.  Consequently, there is no genuine dispute of material fact regarding the Defendants' involvement in failing to pay Plaintiff Clark out-of-class pay for his acting foreman or specialist operations.

### 4.   Change in Plaintiff Clark's Work Route

Defendants also argue that they had no involvement in assigning Plaintiff Clark a different snow route after one of the plows was damaged.  Plaintiffs respond that Defendant Collins must have been the one making the decision to change Plaintiff Clark's snow route because "[n]o one would dare make that decision out from under him as the top management leader anymore that anyone would ever do so in any County Shed across the state." Pls.' Opp. at 37.

In his deposition, Plaintiff Clark testified that the reason his route was changed was because he was being punished for a broken wing plow.  Clark Dep. at 194.  He further testified that Defendant Collins initiated the hearing which investigated the broken wing and therefore must have meted out the punishment

31

complained of by Plaintiff.  *Id.* at 192.  However, Plaintiff alleged no facts which demonstrate that Defendant Collins had any part in meting out that punishment, if in fact that is what it was.  Plaintiff Clark testified that Defendant Collins did not, in fact, even attend the hearing.  *Id.*

Further, Plaintiff Clark was given the choice between taking the oldest snow plow in the fleet to plow Route 84 or plowing the back roads.  *Id.* at 194.  This choice was given by Ken Thiele and relayed to Plaintiff through his foreman, Harvey McKean.  *Id.*  Plaintiff Clark himself admits that he believes the order to have come from Defendant Collins, but has no proof that this was the case. *Id.* Moreover, Plaintiffs present no evidence that would lead this Court to infer that Defendant Collins was involved in the change in snow route merely because he issued the hearing into the broken wing in the first place.  Because Plaintiff's unsubstantiated belief regarding the involvement of Defendant Collins is not sufficient to create a genuine dispute of material fact, summary judgment is granted for Defendants as to this allegation.

5.  Furnishing of Plaintiff Clark's Personnel File

Finally, Defendants argue that Plaintiffs have presented no evidence that Defendant Collins gave Clark's personnel file to Joseph Hogan's attorney for use at his client's hearing.  Plaintiffs respond that Defendant Collins did have personal involvement in this event because "Ms. DeFlorenza witness [*sic*] Collins take the

personnel file out of the Pike County Shed.. [*sic*] Gary saw the file in the lawyers [*sic*] hand in the little courtroom." Pls.' Opp. at 35.

Unfortunately Plaintiffs do not cite to any portion of the record in their assertion that someone saw Defendant Collins remove Plaintiff Clark's personnel file, although this Court gathers that Plaintiffs are referring to Plaintiff Clark's testimony regarding a Ms. Evelyn DiLorenzo. However, even if Plaintiffs can prove that such is the case, they have alleged no facts regarding what Defendant Collins did with that file. This Court cannot make the inference that Defendant Collins must have turned it over to Joseph Hogan's attorney, as Plaintiffs have not put forth sufficient evidence to demonstrate that Joseph Hogan's attorney even had Plaintiff Clark's personnel file in his possession during the hearing. In fact, Plaintiff Clark has testified only that the folder looked like a PennDOT personnel folder but he never saw his name on it, nor did he see Defendant Collins speak to Mr. Hogan's attorney at all during the proceedings. Clark Dep. at 89-92, 256-57. Consequently, summary judgment is granted in favor of the Defendants on this allegation.

**E. Retaliatory Motive**

Defendants argue that Plaintiffs have not proven a retaliatory motivation for most of the supplemental allegations set forth in their Second Amended Complaint, including: (1) the one day suspension for failing to sign the PPIM, (2) Defendant

Collins' implementation of a new purchase form, (3) Defendant Collins'

unresponsiveness to Plaintiff DeGroat's complaints about Barbara Decker and his

conduct at the June 2, 2011 meeting, (4) the removal of trees near the stockpile, (5)

Defendant Collins' direction to Plaintiff Clark to pick up cigarette butts, (6)

Defendant Collins' comment to a fellow employee about Plaintiff Clark, and (7)

Defendant DeFebo's close scrutiny of Plaintiff DeGroat.  Plaintiffs appear to argue

in response that Defendants have evidenced a pattern of pervasive and

overwhelming harassment against them which is sufficient to establish retaliatory

motive.

Defendants continue this argument with regards to the allegations that

Defendant Collins gave Plaintiff Clark's personnel file to Joseph Hogan's attorney

and the rejection of Plaintiff Clark's application for automotive mechanic

supervisor.  Because we have already dismissed these two allegations based on a

lack of personal involvement, the Court will not address Defendants' arguments as

to the lack of retaliatory motivation.

As set forth previously, the third element of a claim for retaliation based on

protected First Amendment activity requires the plaintiff to prove "a causal link

between the constitutionally protected conduct and the retaliatory action." *Thomas

v. Independence Twp.*, 463 F.3d 285, 296 (3d Cir. 2006). If the plaintiff is able to

demonstrate the requisite causation to sustain his or her claim of retaliation, the

defendant may defeat that claim by establishing that it would have taken the same action even if the plaintiff had not engaged in the protected activity. *See Ambrose v. Twp. of Robinson*, 303 F.3d 488, 493 (3d Cir. 2002).

To establish the requisite causation for a retaliation analysis, the plaintiff must typically prove either an unusually suggestive temporal proximity between the protected First Amendment conduct and the allegedly retaliatory action, or a pattern of antagonism coupled with timing. *See Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007) ("After all, if there was not a causal relationship then the District could not have engaged in its conduct in retaliation for appellants having engaged in a protected activity."); *see also Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1302 (3d Cir. 1997) ("[T]he mere fact that adverse employment action occurs after a complaint will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events").

As this statement implies, a very close temporal proximity can sometimes establish a causal link *if it is unusually suggestive*. *See Krouse v. American Sterlizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997) ("Even if timing alone could ever be sufficient to establish a causal link, we believe that the timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred.") (citing *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d

35

Cir. 1989) (finding causation based solely on temporal proximity when an employee was discharged two days after the filing of an EEOC complaint)).

However, "the mere passage of time is not legally conclusive proof against retaliation." *Id.* In the absence of temporal proximity, courts may examine the "intervening period for other evidence of retaliatory animus." *Id.* at 503-4; *see also Robinson v. Southeastern Pa. Transp. Auth.*, 982 F.2d 892, 894 (3d Cir. 1993) ("The temporal proximity noted in other cases is missing here and we might be hard pressed to uphold the trial judge's finding [of causal link] were it not for the intervening pattern of antagonism that SEPTA demonstrated.").

Furthermore, the absence of proof of either of these elements will not necessarily doom a plaintiff's case. Rather, the plaintiff can still prove the requisite causation by demonstrating that the factfinder could infer causation based on the "evidence gleaned from the record as a whole." *Lauren W.*, 480 F.3d at 267 (citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000)). "It is important to emphasize that it is causation, not temporal proximity [or evidence of antagonism], that is an element of plaintiff's prima facie case, and temporal proximity [or antagonism] merely provides an evidentiary basis from which an inference can be drawn." *Kachmar v. SunGuard Data Systems, Inc.*, 109 F.3d 173, 178 (3d Cir. 1997).

1.    <u>Pattern of Antagonism Argument</u>

To begin with, the Court will address Plaintiffs' argument[7] that the above listed actions constitute a pattern of antagonism coupled with timing, which is sufficient to establish retaliatory motive.  Plaintiffs appear to allege that all of the foregoing conduct on Defendants' part together creates a pattern of antagonism, even though the individual actions are not temporally proximate to the initiation of the instant lawsuit.  They argue that the Court can infer retaliatory motive from the fact that the actions, taken together, were "never ending," and that "[t]here [was] a constant time flow." Pls.' Opp. at 34.

Plaintiffs appear to misunderstand the significance of a "pattern of antagonism" to the demonstration of retaliatory animus.  They argue not that there was a pattern of antagonism between the protected activity and the retaliatory action, but rather that each retaliatory action occurred one after another and therefore created a pattern of antagonism in and of itself which can demonstrate retaliatory animus.  This is an incorrect application of the argument.  "Where the time between the protected activity and the adverse action is not so close as to be unusually suggestive of a causal connection standing alone, courts may look to the

[7] Plaintiffs make a general argument in response to Defendants' more tailored arguments on each allegation that a pattern of antagonism existed from which the Court can infer retaliatory animus.  Consequently, we will address this argument in one fell swoop and our determination on this issue applies to all of the following sections 2-8.

intervening period for demonstrative proof, such as actual antagonistic conduct or animus against the employee, or other types of circumstantial evidence . . . that give rise to an inference of causation when considered as a whole." *Marra v. Philadelphia Housing Auth.*, 497 F.3d 286, 302 (3d Cir. 2007).

Nevertheless, because this is an unusual case where the retaliation alleged revolves around relatively innocuous instances of harassment which did little to change the job duties, income, or benefits of the Plaintiffs, this Court will consider Plaintiffs' argument that the Court can infer from the pattern of harassment following the initiation of this lawsuit that Defendants harbored a retaliatory animus. Unfortunately, Plaintiffs' argument still fails as a matter of law, as it is far from clear to this Court that the harassment was never-ending. Rather, the allegedly retaliatory actions began at least six months following the protected activity and have occurred sporadically since then.[8] Without any direct evidence to demonstrate a retaliatory animus on the part of the Defendants, this is insufficient

---

[8] The instant lawsuit was filed on March 12, 2008. In it, Plaintiffs allege fourteen new instances of harassment on the part of Defendants. The first as relates to Plaintiff DeGroat, the one day suspension for the failure to sign the PPIM, occurred in September 2009. The next, Defendant Collins' creation of the purchase form, occurred in June or July 2010. The issues with Barbara Decker began in the winter of 2010-2011. The meeting in Defendant Collins' office occurred on June 2, 2011. Finally, the OIG investigation occurred in August 2011. The only allegation that demonstrates any kind of pattern or ongoing activity, as already explained, is the allegation of Defendant DeFebo's overbearing scrutiny of Plaintiffs' work. As relates to Plaintiff Clark, the incident regarding the Joseph Hogan trial occurred in April 2007, his application was rejected in October 2008, the trees were removed near the stockpile in winter 2009-2010, and he was instructed to pick up cigarette butts in spring 2010. Clark did not receive out-of-class pay in May 2010, Collins' comment regarding the argument was in September 2011, he was assigned to a new snow route in winter 2010, and he alleges constructive discharge in May 2011.

to create a pattern of antagonism so as to satisfy the requisite causal link for a claim of retaliation.[9]

## 2.   PPIM Suspension

In April 2009, the Human Resources Office issued a PennDOT personnel information memorandum (hereinafter "PPIM") regarding the necessity of subpoenas to disclose company documents to third parties, which Plaintiffs allege would have prevented them from disclosing necessary documents to their attorney to assist in this ongoing lawsuit.  Donna DeGroat Deposition at 24-29 (hereinafter "DeGroat Dep.").  Following a meeting with Defendant Collins and the other employees who refused to sign the PPIMs, Plaintiffs were both given a one-day suspension without pay.  *Id.* at 34-37.  Defendants argue a lack of retaliatory animus based on the fact that the suspension occurred a year and a half after the filing of the litigation; moreover, Plaintiffs were the only employees who did not sign the PPIM and there is no evidence of pretext on the part of Defendants.  Plaintiffs respond that Defendant Collins "acted with the verve and aggressively to injure Gary and Donna."  Pls.' Opp. at 35.

Having reviewed the record as a whole, this Court believes that there is no genuine issue of material fact that Defendants suspended Plaintiffs in retaliation for

---

[9] Moreover, because this Court has dismissed five of Plaintiffs' supplemental allegations for lack of personal involvement of the Defendants, these allegations cannot even be considered as contributing to the alleged pattern of antagonism.

the filing of this lawsuit.  Plaintiff DeGroat's testimony clarifies that it was not any of the Defendants who issued the PPIM in the first place; rather it was the Human Resources Department in Harrisburg.  DeGroat Dep. at 25.  That PPIM did not single out the Plaintiffs, as every employee was required to read and sign the document, and Plaintiff DeGroat did not even believe that the PPIM was issued to hinder the present litigation.  *Id*. at 30, 32.  As such, Plaintiffs appear to allege simply that the suspension, which was ostensibly due to their failure to sign the PPIM, was actually a pretext for certain retaliatory reasons.

There is no evidence in the record to back up this argument.  In order to establish pretext and thereby avoid summary judgment, "the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).  In doing so, the plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence.'" *Id.* at 765 (quoting *Ezold v. Wolf, Block, Schoor and Solis-Cohen*, 983 F.2d 509, 531 (3d Cir. 1992)).

Plaintiffs have presented no evidence from which a factfinder could

determine that they were suspended in retaliation for the filing of this lawsuit

rather than for their refusal to sign the PPIM, or that this proffered reason of

Defendants is a pretext for retaliation.  While it is true that they were the only

employees disciplined as a result of the incident, it is also true that they were the

only employees who refused to sign.[10]  DeGroat Dep. at 33-35, 41.  Consequently,

summary judgment is granted for Defendants on this allegation.

3.    Defendant Collins' Purchase Form

Plaintiffs next allege that Defendant Collins retaliated against Plaintiff

DeGroat by designing and implementing a purchase request form that required

Defendant Collins to sign off on certain purchases, and that the form was designed

to make her job more difficult because the form was so convoluted.  Defendants

argue the lack of temporal proximity to the filing of this lawsuit, that Defendant

Collins' reason for implementation of the new form was to cut back on costs, and

that the District Office was using a similar form.  Moreover, they argue, "The fact

that DeGroat believes that the form was a terrible idea does not establish that

asserted reason for it was pretextual." Defendants' Brief in Support at 22, Feb. 28,

2014, ECF No. 122 (hereinafter "Defs.' Supp.").  .  Plaintiff responds that "[Mr.

Collins] knew [the form] would cause harassment, consternation and stress.  That's

---

[10] Plaintiff DeGroat testifies that a few other employees refused to sign the PPIM at first, but they chose to do so after the meeting and on the advice of their union representative.  DeGroat Dep. at 33-35, 41.

precisely why he implemented it and that explains why it failed in a couple of months." Pls.' Opp. at 34.

Plaintiffs have presented no facts which would support an inference of retaliatory animus based on Plaintiff DeGroat's First Amendment activities in relation to the implementation of this purchase form. Specifically, Plaintiff DeGroat testified that many employees were given the responsibility of completing this form when they wanted certain items; she was not the only one who was required to do so. DeGroat Dep. at 87-91. This Court is at a loss to infer retaliatory motivation, without additional proof, for an action directed at an entire group of employees, merely to retaliate against one of those employees. Plaintiff DeGroat also testified that Pike County usually had problems meeting their budget and that Defendant Collins' told her that the reason for the implementation of the form was to cut costs; moreover, he told her that the District Office used a similar form. *Id*. at 85. Plaintiffs have presented no evidence to establish that these given reasons were pretextual. As such, summary judgment is granted in favor of the Defendants on this allegation.

### 4. Defendant Collins' Unresponsiveness to Plaintiff DeGroat's Complaint and the Meeting of June 2, 2011

Barbara Decker was hired as a temporary clerk in the Pike County Maintenance facility in the winter of 2010-2011. DeGroat Dep. at 112. During her employment, Plaintiff DeGroat had a series of difficulties with her and reported

those difficulties to Defendant Collins.  *Id*. at 171, 172, 177.  However, Plaintiff alleges that Defendant Collins did not respond to her concerns but rather scheduled a meeting whereby he criticized Plaintiff instead.  *Id.* Defendants argue that these cannot constitute retaliatory actions primarily because there is no evidence that they were undertaken to punish Plaintiff DeGroat for her protected First Amendment activity.  Plaintiffs respond that Defendant Collins "took the email and exaggerated and distorted its letter and spirit," and that Defendant Collins "was trying to create the impression that Donna was a nosy problem creator." Pls.' Opp. at 34.

Defendants are correct that Plaintiffs have presented no evidence which would create a genuine dispute of material fact regarding either Defendant Collins' responses to Plaintiff DeGroat's complaints or the June 2, 2011 meeting.  With regard to Defendant Collins' unresponsiveness, the record shows that both Defendants Collins and DeFebo actually attempted to respond to Plaintiff's complaints several times, both concerning the incorrect electronic filing as well as Ms. Decker's failure to complete the spreadsheet designed by Plaintiff DeGroat. DeGroat Dep. at 126-129.  Though Defendants may not have addressed all of Plaintiff's complaints, there is no evidence to suggest that they failed to do so in order to punish Plaintiff for initiating this lawsuit.

As for the meeting, at the very most Plaintiff DeGroat's testimony establishes only that Defendant Collins was angered over her complaint about Barbara Decker and her attempt to exercise authority over Ms. Decker, even though Plaintiff DeGroat was not Ms. Decker's supervisor. *Id*. at 170-172.   There is absolutely no evidence to establish retaliatory animus.  The meeting occurred in June 2011, over three years after this lawsuit was initiated.  Moreover, there is nothing to link this meeting and Defendant Collins' unresponsiveness to Plaintiff DeGroat's complaints to this lawsuit or her writing of the letter to the Governor in 2005. Plaintiffs have presented no genuine dispute of material fact that Defendant Collins' motivation for calling the meeting and failing to solve problems Plaintiff DeGroat was having with Barbara Decker was in retaliation for her exercise of protected activity.  Consequently, summary judgment is granted for Defendants on this allegation.

### 5.   Removal of Trees

Plaintiffs allege that Defendant Collins had trees removed along the highway where Plaintiff Clark worked so that Defendant Collins could watch and intimidate him.  Defendants contend that the fact that the removal of the trees caused no harm whatsoever belies any possibility that it was done with an intent to retaliate and, further, that Plaintiff Clark himself is not even aware of why the trees were cut down. Plaintiffs do not respond to this specific assertion, arguing only that the

conduct of Defendants taken as a whole evinces an intent to retaliate and that the trees were cut down "so that Gary could be surveilled."  Pls.' Opp. at 35.  They do not cite to any portion of the record for the assertion that the trees were cut down for this purpose.

Defendants are correct that Plaintiffs have not established any genuine dispute of fact regarding the causal link between their filing of the instant lawsuit and the removal of the trees.  Plaintiff Clark testified that he was not aware of whether Defendant Collins ever parked across from the stockpile where he worked to watch him, although "every now and again" a blue car was parked on the other side of the stockpile, where it would be possible to see the employees working if in fact the viewer had binoculars.  Clark Dep. at 183-85.  Moreover, Plaintiff Clark testified that he didn't often work at that stockpile, so someone who was sitting across the way would rarely ever see him. Clark Dep. at 186.

Even assuming that such an action can be deemed retaliation, there is no evidence whatsoever, aside from unsubstantiated conjecture, that Defendant Collins was even behind the cutting of the trees, much less that he did it in order to retaliate for the filing of this lawsuit or the letter Plaintiff wrote to the Governor in 2005.  The trees were removed in the winter of 2009/2010, about a year and a half following the initiation of this lawsuit and over four years after writing the letter.

Viewing all of the allegations of the Plaintiffs and the record as a whole, this Court cannot find any retaliatory causation in the removal of the trees along the interstate where Plaintiff Clark occasionally worked. Consequently, summary judgment is granted for Defendants on this allegation.

      6.    <u>Cigarette Butts</u>

Defendants next argue that there is no evidence that Defendant Collins' order to Plaintiff Clark to pick up the cigarette butts around the stockpile was retaliatory, both because it was a part of Clark's job duties and because there is no evidence in the record that it was unnecessary. Moreover, they argue, Plaintiff Clark offers a different motivation than retaliation; that is, that Defendant Collins made him clean up the cigarette butts because he was angry that Plaintiff refused to fill in as acting foreman, a position he was trained to do. Again, Plaintiff only responds to the argument in a general sense as constituting part of a pattern of antagonism.

There is nothing in the record which could satisfy the causal link of retaliatory motivation with regard to this allegation. There is evidence that Plaintiff Clark was the only employee required to pick up the cigarette butts and that he was required to do so by hand, even though the employees typically do so with equipment. Clark Dep. at 162, 165. However, he also testified that it was within his job duties to pick up the cigarette butts. *Id*. at 164 ("I don't think at that

46

particular time [the union] could do anything, because picking up cigarette butts probably is within your classification of any PennDOT employee.  I think that's what I was told.").  Moreover, Defendant Collins' motivation for requiring Plaintiff Clark to pick up the cigarette butts is clearly anger for his refusal to be the acting foreman, not in retaliation for the exercise of his First Amendment rights in initiating this lawsuit.  Specifically, Plaintiff Clark testified, "I just remember Bob [Collins] was right in my face about taking the acting foreman's job, that I couldn't refuse it because I had been trained to do it." *Id.* at 159.  As such, summary judgment is granted in favor of Defendants as to this allegation.

### 7.   Defendant Collins' Comment Regarding Plaintiff Clark

Plaintiffs allege that Defendant Collins had made a comment to other Pike County employees that Plaintiff Clark was likely the individual who had gotten into an argument with a motorist earlier in the day.  Clark dep. at 200-1.  Defendants argue first that the comment "is so innocuous . . . that it is difficult to conceive that its intent was to punish Clark for this lawsuit." Defs.' Supp. at 27.  They further contend that the fact that Defendant Collins later apologized to Plaintiff Clark suggests that it was merely a thoughtless comment rather than a targeted retaliation.  Plaintiff responds with the same argument and does not address this specific allegation.

47

Plaintiffs have presented no evidence from which to draw a link between this lawsuit and Defendant Collins' statement regarding Plaintiff Clark.  Plaintiff Clark did testify that Defendant Collins had said that statement without knowledge of who actually took part in the offending argument.  Clark Dep. at 200-1. However, the fact that Defendant Collins apologized for his misinformation belies any suggestion that the statement was retaliatory in nature.  *Id*. at 202.  Mere thoughtlessness and insensitivity does not in and of itself imply retaliatory motive. It is the Plaintiffs' burden to establish this retaliatory link, which they have not done here.  Consequently, summary judgment is granted in favor of the Defendants on this allegation.

### 8.   Defendant DeFebo's Close Scrutiny of Plaintiff DeGroat

As she did in her original complaint, Plaintiff DeGroat alleges that Defendant DeFebo, with approval from Defendant Collins, continued to micromanage her work and make nit-picking corrections after the filing of this lawsuit.[11]  DeGroat Dep. at 45-46.  Defendants argue once again that Plaintiffs have not made any showing of retaliatory motivation for this nit-picking and allegedly overbearing behavior.  Plaintiffs do not respond to this argument, other than with the same general pattern of antagonism argument, which has already been addressed.

---

[11] She alleges that he took copious notes of her purchasing card reconciliations and sometimes considered them late because he did not think she had attached complete documentation. DeGroat Dep. at 46, 58-60.

The Court finds that a reasonable factfinder could determine that this pattern of overbearing scrutiny is in retaliation for Plaintiffs' exercise of her First Amendment activities.  The close scrutiny began in 2005 after Plaintiff DeGroat drafted the letter to the Governor.  *Id*. at 48-49.  That scrutiny has continued for nine years up until the filing of the instant motion.  *Id.* Though there is no direct evidence linking Defendant DeFebo's scrutiny to the filing of this lawsuit or the writing of the letter, the fact that the scrutiny began directly after Plaintiff wrote the letter and has continued is enough to infer retaliatory animus.

Moreover, the fact that the conduct of Defendant DeFebo did not change in any significant way following the filing of the instant lawsuit does not necessarily imply that any retaliation exercised was not linked to that event.  As explained previously, the initial exercise of First Amendment rights is inextricably linked with the filing of a section 1983 retaliation lawsuit.  It would be entirely plausible for a jury to find that Defendant DeFebo's scrutiny began as a result of the writing of the letter and continued as a result of the initiation of this lawsuit. Consequently, Defendants' argument that this allegation lacked retaliatory animus as a matter of law must fail.

## F. Adverse Action

Even though this Court has determined that Defendants' argument on Defendant DeFebo's lack of retaliatory animus must fail, we must still address

Defendants' argument that the allegedly overbearing scrutiny of Plaintiff DeGroat's work did not constitute adverse action.[12]  They contend that courts have routinely rejected claims based on these types of micromanagement or work criticisms.  Plaintiffs do not respond to this argument.

The Third Circuit has held that an adverse action by the government is sufficient to support a retaliation claim if "the alleged retaliatory conduct was sufficient to deter a person of ordinary firmness from exercising his First Amendment Rights." *Allah v. Seiverling*, 229 F.3d 220, 225 (3d Cir. 2000) (quotations omitted). This means that "normally petty slights, minor annoyances, and simple lack of good manners" will not support a claim of retaliation. *Burlington Northern & Sante Fay Fwy. Co. v. White*, 548 U.S. 53, 68 (2006). However, it is also true that an extended campaign of petty harassments is sufficient to deter a person of ordinary firmness from exercising her rights and will consequently support a retaliation claim. *See Suppan v. Dadonna*, 203 F.3d 228, 235 (3d Cir. 2000).

Judge Munley previously held that Defendant DeFebo's constant overbearing scrutiny as a result of Plaintiffs' protected activities at that point could, in conjunction with various other petty harassments, constitute adverse action. However, that conclusion was highly fact-specific and depended in large part on

---

[12] As all of Plaintiffs' other allegations have been dismissed on other grounds, the Court will not address Defendants arguments based on the lack of adverse action as they relate to those allegations.

the other allegedly retaliatory actions that Plaintiffs suffered as a result of their initial protected activity.[13]

Here, this is the only surviving allegation based on the filing of the instant lawsuit.  It is undeniably a minor annoyance, since it did nothing to affect Plaintiff DeGroat's job duties, income, or benefits.  *See, e.g., McKinnon v. Gonzales*, 642 F.Supp.2d 410, 428 (D.N.J. 2009) ("Foremost among the negative experiences that do not amount to materially adverse actions are Plaintiff's allegations that AW Nichols intensified her supervision of Plaintiff … and micro-managed his whereabouts.") (citations omitted).  Rather, it is a frustration that many employees experience on a daily basis in a multitude of jobs.  Moreover, the Court cannot consider this part of a campaign of retaliatory actions because it is the only one alleged based on the filing of the instant lawsuit that carries any inference of retaliatory animus whatsoever.  Consequently, there can be no campaign of retaliation in this case and summary judgment is granted for Defendants as to this allegation.

## G. Constructive Discharge

---

[13] The prior motion for summary judgment did not have before it the issue of public concern; consequently, the Court did not need to decide whether the asserted bases of retaliation were sufficient to bring a retaliation lawsuit against a public employer.  Today, this Court limits the bases on which Plaintiffs can claim retaliation to the writing of the letter and the instant lawsuit only to the extent that the jury finds the original retaliatory actions predicated on the writing of that letter.  As such, though this Court has previously determined that Plaintiffs have sufficiently proven that their initial allegations constituted adverse action, they can only do so to the extent they can prove to a jury that Defendants retaliated against them for the writing of the letter to the Governor.  *See supra*, Part III.C.

Finally, Defendants argue that Plaintiff Clark cannot assert a claim for constructive discharge because their conduct towards him was neither frequent nor severe, and what they did subject him to was not enough to compel a reasonable person to resign under an objective standard for recovery.  They further argue that Plaintiff Clark did nothing to explore alternative avenues before his resignation. Plaintiffs respond that the harassment was in fact frequent and severe, and they further appear to argue that Plaintiff Clark's decision to retire should be governed by a subjective standard, although they cite to no case law for this proposition.

Public employee resignations and retirements are presumed to be voluntary until the employee "presents evidence to establish that the resignation or retirement was involuntarily procured." *Leheny v. City of Pittsburgh*, 183 F.3d 220, 227 (3d Cir. 1999).  To establish a constructive discharge, a plaintiff must demonstrate that the employer "knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." *Mandel v. M&Q Packaging Corp.*, 706 F.3d 157, 169 (3d Cir. 2013) (citing *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1084 (3d Cir. 1996).  This is an objective test; consequently, "an employee's subjective perceptions of unfairness or harshness do not govern a claim of constructive discharge." *Id.*

In determining whether an employee was constructively discharged, the court can consider a number of factors, including whether he or she was threatened

with discharge, encouraged to resign, demoted, subject to reduced pay or benefits, involuntarily transferred to a less desirable position, subject to altered job responsibilities, or given unsatisfactory job evaluations. *See Colwell v. Rite Aid Corp.*, 602 F.3d 495, 503 (3d Cir. 2010); *see also Clowes v. Allegheny Valley Hosp.*, 991 F.2d 1159, 1161 (3d Cir. 1993).  It is important to note that "employees are not guaranteed stress-free environments and . . . discrimination laws cannot be transformed into a palliative for every workplace grievance, real or imagined, by the simple expedient of quitting." *Connors v. Chrysler Financial Corp.*, 160 F.3d 971, 976 (3d Cir. 1998) (citations omitted) (citing *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1083 (3d Cir. 1992).

Additionally, a reasonable employee will usually explore alternative avenues before coming to the conclusion that resignation is the only option, such as a transfer of position, consulting with human resources or filing a grievance. *See Clowes*, 991 F.2d at 1161; *see also Bozé v. Branstetter*, 912 F.2d 801, 805 (5th Cir. 1990); *see also Garner v. Wal-Mart Stores, Inc.*, 807 F.2d 1536, 1539 (11th Cir. 1987).

In this case, Plaintiff Clark alleges severe and frequent harassment which includes all of the allegedly retaliatory incidents following the filing of this lawsuit and presumably those which occurred as a result of the mailing of the letter to the Governor.  However, as already discussed, most of these allegations do not create a

genuine dispute of material fact to survive summary judgment.  Moreover, even if

they could survive, such isolated incidents over a period of close to ten years from

2005 to the present do not constitute conditions "so intolerable that a reasonable

person subject to them would resign."  While some of the incidents may be

humiliating or demeaning to Plaintiff Clark, the allegations amount to little more

than ordinary workplace grievances.

Furthermore, in terms of severity the allegations do not amount to much.

Defendants did once threaten Plaintiff Clark with discharge for not signing the

PPIM, but this event occurred over a year and a half before he ultimately resigned.

Clark Dep. at 218-19.  Defendants never encouraged him to resign, he was not

demoted and his pay was not reduced.  *Id*. at 217-219.  He was not transferred to a

less desirable position or given unsatisfactory job responsibilities.  *Id*. at 218.  The

removal of trees near the stockpile, Defendant Collins' instruction to pick up

cigarette butts, and Collins' comment to fellow employees can hardly be

considered to have made work intolerable for Plaintiff Clark.  It is true that he was

temporarily transferred to what he believes to be a less desirable position of

plowing the back roads rather than Interstate 84, that his application for a better

position was rejected, and that he did not receive out-of-class pay for specialist

work that he performed.  However, these three incidents, even in conjunction with

the aforementioned incidents, do not amount to an intolerable working

54

environment.  Certainly a reasonable person would not resign from his position based on few isolated incidents, the severity of which were minimal and which did little to injure his current position, his income, or his career prospects.

Moreover, Plaintiff failed to explore any alternative avenues before deciding that resignation was his only option.  Defendants presented uncontroverted evidence that Plaintiff Clark did not discuss his plans with either a supervisor or a representative.  Clark Dep. at 210.  Consequently, summary judgment will be granted in favor of Defendants on Plaintiffs' claim of constructive discharge.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion for Partial Summary Judgment is granted in its entirety.  An appropriate Order follows.

BY THE COURT:

/s Matthew W. Brann
Matthew W. Brann
United States District Judge